**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

WESLEY DEAN HESTER,

      Plaintiff,

v.                                     Case No. 2:23-cv-00516 DHU-LF

LEA COUNTY CORRECTIONAL FACILITY
(GEO GROUP) STAFF; NEW MEXICO
CORRECTIONS DEPARTMENT; WEXFORD
HEALTH SERVICES AND STAFF THEREOF,

      Defendants.

**PROPOSED FINDINGS AND RECOMMENDED DISPOSITION
REGARDING GEO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

    This matter comes before the Court on the GEO Defendants' Motion for Summary

Judgment and Memorandum of Law in Support, filed September 3, 2024. Doc. 56. Defendants

The GEO Group, Inc.; Officer Keagen Pollard; Mental Health Director Stacey Massengill-

Munroe; Captain Rick Condarco; Case Manager Rachel Gomez; Dwayne Santistevan; and

Moriama Valeriano (collectively, the "GEO Defendants") move for summary judgment against

pro se Plaintiff Wesley Dean Hester. Specifically, they argue that no employee of GEO violated

Mr. Hester's rights under the Eighth or Fourteenth Amendments, there is no basis upon which

*Monell* liability may be imposed against GEO, and Mr. Hester did not exhaust his administrative

remedies. *Id.* at 1. Mr. Hester responds via a series of Memorandum Replies, each incorporated

within the others by reference. *See* Docs. 69–75.

    District Judge Davis H. Urias referred this case to me "to conduct hearings, if warranted,

including evidentiary hearings, and to perform any legal analysis required to recommend to the

Court an ultimate disposition of the case." Doc. 14. Having reviewed the parties' submissions

and the applicable law, I recommend granting the GEO Defendants' Motion (Doc. 56) in part,

for the reasons discussed below.

## BACKGROUND

Mr. Hester is an inmate at the Lea County Correctional Facility ("LCCF").[1] Doc. 11 at 2.

He seeks damages and injunctive relief under 42 U.S.C. § 1983 and the New Mexico Tort Claims

Act ("NMTCA"), N.M. STAT. ANN. § 41-4-1 *et seq.*, for "cruel and unusual punishment,

deliberate indifference, negligence, and denials of due process committed by the defendants."

Doc. 11 at 2. Specifically, Mr. Hester alleges that the defendants have withheld medications,

water, and medical testing and treatments, which have exacerbated his medical conditions and

led to strokes, partial blindness, hearing loss, partial paralysis, and other serious medical

consequences. *Id.* Mr. Hester is "wheelchair-bound" and, following the medical complications he

cites, is "almost completely incapacitated." *Id.* More details about the facts surrounding each

incident will be discussed as I analyze the different claims; here, I simply identify the allegations

at issue.

Specifically, as against the GEO Defendants, Mr. Hester alleges Eighth and Fourteenth

Amendment violations.[2] *Id.* at 11. The Eighth Amendment violations include: 1) Defendant

Alderete "subjecting [Mr. Hester] to death threats from other inmates by knowingly making false

---

[1] Since the filing of his amended complaint, Mr. Hester was moved to the Long Term Care Unit at the Central New Mexico Correctional Facility on or about November 15, 2024, after receiving care from "outside medical facilities" from November 5, 2024, until November 15, 2024. Doc. 91.

[2] Mr. Hester was granted permission to amend his complaint to add a defendant, purportedly an officer at LCCF, and to add retaliation claims against this defendant. Doc. 117 at 7–8. However, I ordered the amended complaint filed by February 24, 2025. *Id.* at 9. Mr. Hester has not filed a Second Amended Complaint, and the deadline has passed. Accordingly, the First Amended Complaint (Doc. 11) remains the operative complaint in this matter.

and defamatory statements to them; and thereby endangering [his] life and health" (Count I-C);

2) Defendants Pollard and Massengill-Munroe "denying [Mr. Hester] water for extended periods

of time and giving [him] vermin infested bedding; and thereby endangering [his] life and

damaging [his] health" (Count I-D); 3) Defendant GEO and the individual GEO Defendants

"failing to remedy the abuses" above, as well as alleged abuses by Nurse Practitioner Aiste

Chamblin and Wexford Health Services (together, the "Medical Defendants"), "despite knowing

these factors endangered [Mr. Hester's] life and health" (Count I-E); and 4) Defendant GEO

"failing in [its] duties to train, supervise, and direct personnel under [its] authority" such that the

above abuses occurred (Count I-F). *Id.* at 6. The Fourteenth Amendment violations include 1)

Defendant Smith "repeatedly obstructing and denying my scheduled telephonic court hearings"

(Count II-I); 2) Defendant Valeriano "continually and repeatedly obstructing, denying, and

failing to respond to steps of the process of administrative remedy" (Count II-J); and 3)

Defendant GEO "failing in [its] duties to train, supervise, and direct personnel under [its]

authority, and promulgating policies such that" all of the above abuses, and alleged abuses by the

Medical Defendants, occurred (Count II-K). *Id.*

## LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) allows a party to move for summary judgment,

which the court shall grant "if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." The parties must provide

sufficient evidence "by reference to an affidavit, a deposition transcript or a specific exhibit

incorporated" in the party's motion. *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1546 (10th Cir.

1995). That is, the Court will only review the portions of the record that the parties identify: it

"will not search the record [without a specific reference] in an effort to determine whether there

exists dormant evidence which might require submission of the case to a jury." *Id.* (citation

omitted); *see also Ogden v. San Juan Cnty.*, 32 F.3d 452, 455 (10th Cir. 1994) (pro se litigants

are not excused of their obligation "to comply with the fundamental requirements of the Federal

Rules of Civil and Appellate Procedure); *McKinzy v. I.R.S.*, 367 F. App'x 896, 897 (10th Cir.

2010) (requiring pro se litigant, like any other litigant, to cite pertinent legal authorities and

record evidence). At the summary judgment stage, "a *Martinez* report is treated like an affidavit,

and the court is not authorized to accept its fact findings if the prisoner has presented conflicting

evidence." *Northington v. Jackson*, 973 F.2d 1518, 1521 (10th Cir. 1992).

## ANALYSIS

### I. Preliminary Matters

I begin with a few overarching matters before proceeding to the merits of each claim.

First, the GEO Defendants put forth a list of undisputed material facts. Doc. 52 at 4–19. Mr.

Hester's response identifies "many questions [the GEO Defendants] have left still unanswered,"

Doc. 74 at 7–9, but he does not dispute the facts themselves as required by D.N.M.LR-Civ.

56.1(b). The local rules dictate that "[a]ll material facts set forth in the Memorandum will be

deemed undisputed unless specifically controverted." D.N.M.LR-Civ. 56.1(b). Pro se litigants,

though "entitled to a liberal reading of their filings," *Abdulhaseeb v. Calbone*, 600 F.3d 1301,

1310 (10th Cir. 2010), still are required to comply with the procedural requirements of Rule 56,

*Lammle v. Ball Aerospace & Techs. Corp.*, 589 F. App'x 846, 849 (10th Cir. 2014).

Mr. Hester has not used the proper form (i.e., going number-by-number through the GEO

Defendants' facts to indicate which, if any, are disputed) to contest any of the facts that the GEO

Defendants asserted. However, he has raised some arguments regarding missing or contradictory

documentation. *See, e.g.*, Doc. 74 at 2. Where Mr. Hester provides citations to the record to

contradict a fact that the GEO Defendants put forward, I recommend considering those facts disputed. Where he does not acknowledge a fact, merely questions it, or states that it is untrue without reference to record evidence, I recommend considering those facts undisputed.

The GEO Defendants argue that Mr. Bolton, Mr. Hester's former cellmate, composed Mr. Hester's memorandum replies for him and that the lawsuit therefore must be dismissed on prudential standing grounds given Mr. Bolton's unauthorized practice of law. Doc. 78 at 2–5. I recommend that the Court reject this argument. Mr. Bolton's affidavit states, "I draft, write, and prepare all [Mr. Hester's] documents for the Court, *to the extent allowed within CD policy.*" Doc. 75 (emphasis added). Though Mr. Bolton describes Mr. Hester as being essentially completely incapacitated, I conducted a status conference on January 31, 2025, in which I spoke to Mr. Hester and found that he understood what I was saying and responded logically to it. *See* Doc. 113 at 2. Although the hearing was a status conference and not an evidentiary hearing, I am not concerned about Mr. Hester's ability to communicate his thoughts clearly. To the extent that Mr. Hester's physical disabilities may have limited his ability to write, dictating to Mr. Bolton is appropriate and does not constitute the unauthorized practice of law. As a result, I do not recommend dismissing the case based on the purported unauthorized practice of law by Mr. Bolton.

Finally, the GEO Defendants argue that Mr. Hester failed to exhaust the necessary administrative remedies before bringing these claims. Doc. 56 at 23. Specifically, they assert that exhaustion of administrative remedies consists of "completion of the grievance process through the Department-Level Appeal," which Mr. Hester did not do for any of his claims in this case. Doc. 56 at 24 (quoting Doc. 52 at 16); *see also* Doc. 55-11 at 2 (New Mexico Corrections Department inmate grievance policy). Rather, Mr. Hester pursued informal complaints and at one

point attempted to escalate an informal complaint to a formal grievance, which the grievance office has no record of receiving. Doc. 52 at 17–18; Doc. 55-4 at 4; Doc. 11 at 25–26 (scan of the grievance in question). Mr. Hester states that he took all steps available to him in the grievance process and that it would be an "inherently absurd situation" if the defendants required exhaustion of administrative remedies but did not have to allow a process for administrative remedies to occur. Doc. 74 at 4–5.

As a point of clarification, inmates are required to exhaust whatever administrative remedies exist; if an institution has no grievance process, inmates may file directly in court. Inmates have an obligation to exhaust all "available" administrative remedies, but if a remedy is 1) a "dead end" (such as when "administrative officials have apparent authority [to provide relief], but decline ever to exercise it"), 2) "so opaque that it becomes, practically speaking, incapable of use" ("so that no ordinary prisoner can make sense of what it demands"), or 3) inaccessible because "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation" (such as by "misl[eading] the inmate as to the existence or rules of the grievance process so as to cause the inmate to fail to exhaust such process"), the remedy is not available and the inmate need not exhaust it. *Ross v. Blake*, 578 U.S. 632, 643–44 (2016).

Mr. Hester attempted to escalate his grievance regarding Defendant Alderete's actions and Mr. Hester's time in the RHU, and the grievance is stamped "Received." Doc. 11 at 25. Defendant Valeriano's affidavit, however, indicates that it was not received. Doc. 55-4 at 4. I believe that this discrepancy constitutes a genuine dispute of material fact regarding whether Mr. Hester properly pursued his grievance and was somehow thwarted. Accordingly, I recommend that the Court proceed with the motion for summary judgment regarding the conduct of

Defendant Alderete and the other defendants who allegedly were involved with Mr. Hester's time in the RHU (Count I-C, Count I-D, and Counts I-E and I-F as they pertain to the conduct of Defendants Alderete, Pollard, and Massengil).

The other claims are clearer on the matter of administrative exhaustion. The record indicates that Mr. Hester escalated his informal complaint against Defendant Smith to a formal grievance and that it was returned because he had not attached the informal complaint to the application. Doc. 69-1 at 5. There is no evidence that he appealed this decision to the department level as necessary to exhaust remedies. Similarly, two informal complaints against Defendant Chamblin were escalated to a formal grievance but not appealed to the department level. *See id.* at 24–26, 30–32, 34. Others remained at the informal complaint level and were not escalated to formal grievances. *See id.* at 27–29, 35–37, 95 (against "Wexford Medical"). The only departmental appeal in the file pertains to Mr. Hester's access to his legal mail, which is not a claim in this case. *Id.* at 110. Accordingly, as to the claims against the GEO Defendants pertaining to alleged conduct by the Medical Defendants, Defendant Smith, and Defendant Valeriano (Counts I-E and I-F as they pertain to the conduct of the Medical Defendants and Counts II-I, II-J, and II-K as they pertain to the conduct of the Medical Defendants, Defendant Smith, and Defendant Valeriano), I recommend finding that Mr. Hester did not exhaust the grievance process and that the GEO Defendants are therefore entitled to summary judgment on these claims.

Nonetheless, because the Court may rule differently than I recommend on the issue of administrative exhaustion, I analyze the merits of all claims below.

## II. Claims Pertaining to Defendant Alderete's Actions (Counts I-C and I-E in Part)

As pertains to Defendant Alderete, Mr. Hester alleges the following facts:

> 7. On 3-21-21, during a facility lockdown, my caretaker/cellie, Isaiah Bolton #66748, placed a letter to the Security Threat Investigation Unit (STIU) in the cell door (H2-D-109) for unit staff to put in the mail. At about midnight, defendant Alderette [sic] removed the letter. Over the next few days, the pod remained on lockdown, with limited numbers of inmates being let out for showers. During these times, multiple inmates and groups of inmates came to my locked call door, making threats and statements including but not limited to; "When these doors open, we're gonna kill you both," "Alderette [sic] gave me that snitch letter you guys sent," and "She [defendant Alderette [sic]] told me you two were in prison for raping little kids."
> 8. Defendant Alderette [sic] had taken the letter my cellie (Bolton) had sent to STIU, given it to a known member of the 'Roswell Boys' prison gang, and had falsely claimed to him and other inmates that I and my cellie were 'child molesters' and 'needed to be gotten rid of.'
> 9. The pod was briefly let off lockdown on 3-30-21. My cellie and I continued to receive threats from other inmates. That evening, the pod was put back on lockdown and my cellie and I were removed from the pod and put in RHU/SEG. These events and the fact of threats made and my life being put in danger are documented by camera footage, my subsequent placement in protective custody, and defendant Condarco's reply to a grievance I filed on these matters, and Lt. Hooks' reply to another grievance I filed on these matters.

Doc. 11 at 7. Mr. Hester's claim against Defendant Alderete is for violations of the Eighth Amendment for "subjecting" him "to death threats from other inmates." *Id.* at 6. He also claims Eighth Amendment violations by Defendants GEO, Santistevan, Massengil, Condarco, Valeriano, Gomez, and Pollard for failing to remedy the abuses of Defendant Alderete. *Id.*

### A. Claim Against Defendant Alderete (Count I-C)

The GEO Defendants argue that Mr. Hester failed to serve Defendant Alderete and she was never made a party defendant to the action; therefore, any claims against her must be dismissed pursuant to Federal Rules of Civil Procedure 4(m) and 12(b)(5). Doc. 56 at 4. In all documents incorporated by reference into Mr. Hester's response, he does not mention the service issue at all. *See generally* Docs. 69–75. A review of the docket indicates that Mr. Hester

attempted to serve Defendant Alderete, *see* Doc. 12 at 8, but nothing on the docket indicates that Defendant Alderete ever received the summons. The Court instructed Mr. Hester what to do "[i]f the initial attempt to obtain a waiver of service fail[ed]," Doc. 13 at 3, but Mr. Hester did not further attempt to serve Defendant Alderete.

Because Defendant Alderete was never served and never entered a limited appearance to contest service, the Court is in the peculiar position of ruling on a motion by one set of parties to dismiss a different party under Rule 12(b)(5). Nevertheless, it is clear that the Court lacks personal jurisdiction over any defendant not properly served. *Omni Cap. Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987) ("Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied."). Further,

> If a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

FED. R. CIV. P. 4(m).

The GEO Defendants' motion put Mr. Hester on notice that service is deficient as to Defendant Alderete.[3] *See* Doc. 56 at 4. Mr. Hester did not address the service issue in his responses. *See generally* Docs. 69–76. Mr. Hester also was made aware of the proper procedure if Defendant Alderete did not provide a waiver of service: to provide an updated address and to

---

[3] A district court within the Tenth Circuit addressed a similar issue in *Kelley v. City of Atchison, Kansas*, No. 2:21-cv-02123, 2021 WL 5140320, at *3 (D. Kan. Nov. 4, 2021). In *Kelley*, the plaintiff failed to provide sufficient information to the Marshals Service for service of process. *Id.* The Court notified the plaintiff that if he failed to timely file the notice of information or to effect service, his claims could be dismissed. *Id.* The plaintiff did not respond or show good cause, so the Court dismissed the unserved defendants without prejudice under Federal Rule of Civil Procedure 12(b)(5). *Id.* Here, although the Court itself has not provided the notice, the motion by the GEO Defendants seeking to dismiss the claims for lack of service is sufficient to notify Mr. Hester of the possible consequences of improper service.

seek leave to proceed in forma pauperis. Doc. 13 at 3. Mr. Hester did not take these steps, nor has

he shown good cause for failing to timely serve Defendant Alderete. Accordingly, I recommend

that the Court dismiss Mr. Hester's claim against Defendant Alderete without prejudice for lack

of personal jurisdiction and failure to serve.

**B. Claim Against Defendant GEO for Failure to Remedy the Abuses of Defendant Alderete (Count I-E in Part)**

The GEO Defendants also address Mr. Hester's potential claim that GEO failed to

remedy the alleged abuses of Defendant Alderete (Count I-E in part). Doc. 56 at 4. The

undisputed material facts do not discuss the conduct of Defendant Alderete at all. *See generally*

Doc. 52 at 4–19. However, a party moving for summary judgment may satisfy its burden by

demonstrating that the nonmoving party has no evidence to support an essential element of its

claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("Rule 56(c) mandates the entry of

summary judgment . . . against a party who fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will bear the

burden of proof at trial."). The GEO Defendants allege that claims against GEO based on

Defendant Alderete's conduct must fail because Mr. Hester has not submitted evidence that

Defendant Alderete violated Mr. Hester's Eighth Amendment rights.

The undisputed material facts indicate that on March 30, 2021, Officer Jake Etter with the

Security Threat Investigation Unit at LCCF received an anonymous letter "indicating that inmate

Hester and his cellmate, Isaiah Bolton, were both going to be assaulted due to prior sex charges."

Doc. 52 at 7. Officer Etter confirmed that Mr. Bolton had prior sex charges and alerted another

officer, Captain Fike, who pulled Mr. Hester and Mr. Bolton from their housing pod and placed

them in the RHU for their own protection. *Id.* No evidence of how any inmate came to know that

Mr. Bolton had prior sex charges exists; Mr. Hester alleges that it is because Defendant Alderete

told certain inmates this information, but he has provided no support for this allegation. Without any evidence regarding Defendant Alderete's conduct, Mr. Hester cannot prevail on an Eighth Amendment claim against GEO and other individual defendants for failing to remedy that conduct.

For that reason, I recommend granting summary judgment for GEO on the claim that it failed to remedy Defendant Alderete's alleged abuses.

**C. Individual Defendants' Failure to Remedy the Abuses of Defendant Alderete (Count I-E in Part)**

The GEO Defendants do not address Mr. Hester's claims against individual defendants Santistevan, Massengil, Condarco, Valeriano, Gomez, and Pollard for failing to remedy Defendant Alderete's alleged abuses (Count I-E in part). However, because there appears to be no evidence of any abuses by Defendant Alderete, I do not believe Mr. Hester can prevail on these claims. Federal Rule of Civil Procedure 56(f) states, "After giving notice and a reasonable time to respond, the court may . . . consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute." I therefore recommend providing the parties with notice and an opportunity to respond to the Court's belief that Mr. Hester has no evidence to support his claims against individual defendants Santistevan, Massengil, Condarco, Valeriano, Gomez, and Pollard for failing to remedy Defendant Alderete's alleged abuses. There is no discussion of Defendant Alderete's conduct in the Undisputed Material Facts at all, much less any evidence that Defendant Alderete informed other prisoners that Mr. Hester's cell-mate had prior sex convictions. Without any evidence that Defendant Alderete violated Mr. Hester's rights, no other defendant can be held responsible for his or her failure to remedy Defendant Alderete's alleged abuses.

### III. Mr. Hester's Time in the Restricted Housing Unit ("RHU") (Counts I-D and I-E in Part)

#### A. Allegations

Mr. Hester makes the following allegations against the individual GEO Defendants regarding his time in the RHU.

> 10. I spent the next 21 days in RHU/Seg. Due to PTSD, I was unable to eat. Defendants Pollard and [Unnamed CO 1 and 2] retaliated by claiming I was on hunger strike, and using this as excuse [sic] to turn off water to my cell for periods of 3 days, another 3 days, and 8 days. Also, my bedding had small biting insects in it that caused me rashes and sores; and defendants Pollard, [unidentified CO 1 and 2] and all other staff refused to allow me a shower. During this time, I made multiple written and verbal requests to every staff member I could (including but not limited to defendants Santistevan, Condarco, Gomez, Pollard, and [Unidentified CO 1 and 2], but all refused to turn the water on, provide clean bedding, or allow me a shower. During this time, defendant Pollard harrased [sic] me every night he was present, by repeatedly waiting until I was asleep, and turning the water on and flushing the toilet, then turning the water back off before I could get up. Also during this time, I was pulled out several times for interrogation by defendant Condarco. Each time, I asked Condarco and all other staff present for my water to be turned back on. Each time, defendant Condarco refused, and stated "Mental Health ordered your water left turned off."
>
> 11. During the 8 day period without water (on day 6), Dr. Acharya visited me, determined I was not on hunger strike, and ordered [unidentified CO #1] to turn my water on. After Dr. Acharya left, I asked [unidentified CO #1] to turn the water on. He refused, stating "Mental Health countermanded that" and walked away.

Doc. 11 at 7. Mr. Hester makes Eighth Amendment claims against Defendants Pollard and Massengil for denying him water and providing him vermin-infested bedding, and against Defendants GEO, Santistevan, Massengil, Condarco, Valeriano, Gomez, and Pollard for failing to remedy the conduct of Defendants Pollard and Massengil. *Id.* at 6. He also alleges that GEO failed in its duty to train, supervise, and direct its personnel and promulgating policies such that the events in the RHU occurred. *Id.*

## B. Background

The undisputed material facts indicate that Mr. Hester was placed in the RHU on March 30, 2021. Doc. 52 at 7. Clinician notes indicated that Mr. Hester reported eating and sleeping within normal limits on March 31. *Id.* It was not until April 2, 2021, that the behavioral health provider was informed that Mr. Hester was refusing to eat. *Id.* at 8; *see also* Doc. 55-6 at 14. He refused meals on April 3 and 4, but he did not declare a hunger strike. Doc. 52 at 8; *see also* Doc. 55-5 at 2; Doc. 55-6 at 14. A therapist visited Mr. Hester on April 5 and reported that he was "angry and uncooperative," that he "yelled at this therapist," and that he "would not communicate." Doc. 52 at 8; Doc. 55-6 at 14. On the same day, Mr. Hester reported that he did not need medical assistance. Doc. 52 at 9; Doc. 55-9 at 44; Doc. 55-10 at 10. On April 6, Mr. Hester reported to a medical provider, "I'm fine. I'm just pissed because I shouldn't be in here and it is my right to talk to STIU." Doc. 52 at 9; Doc. 55-10 at 9. Various staff members visited Mr. Hester that day, and the housing unit event log for that date contained a note that at 3:00 p.m., Mr. Hester drank water. Doc. 52 at 9; Doc. 55-9 at 55. A medical provider offered Mr. Hester the opportunity to be seen in the clinic, and Mr. Hester indicated that he needed more time to think about it. Doc. 55-10 at 7. This provider's notes indicated that security staff witnessed Mr. Hester using the restroom inside the cell. *Id.*

On April 7, Mr. Hester refused his midday meal and was escorted to the STIU office to meet with security officials. Doc. 52 at 10; Doc. 55-9 at 63–64 (referring to Mr. Hester as "B102," his cell number in the RHU). A group of medical and behavioral health providers met to discuss Mr. Hester's situation and concluded that Mr. Hester was choosing not to eat despite prison security continuing to serve him meals, but that he was not on a hunger strike. Doc. 52 at 11–12; Doc. 55-10 at 5. They elected to continue monitoring his condition and recommended

daily weight checks. Doc. 52 at 11–12; Doc. 55-10 at 5. That evening, Mr. Hester refused his

meal and refused water offered by medical staff. Doc. 52 at 12; Doc. 55-9 at 66. On April 8, New

Mexico Corrections Department ("NMCD") documentation notes indicate that a behavioral

health provider came to visit Mr. Hester, but Mr. Hester dismissed this person's visit as a waste

of time. Doc. 52 at 12; Doc. 55-6 at 13. On April 9, Mr. Hester refused his evening meal, and an

officer turned on Mr. Hester's water so he could flush his toilet and wash his face. Doc. 52 at 12;

Doc. 55-9 at 81, 84–85. A medical staff member visited Mr. Hester and asked Mr. Hester to come

have his weight checked and if he wanted water, and Mr. Hester shook his head side to side. Doc.

52 at 12;[4] Doc. 55-10 at 4. On April 10, Mr. Hester refused all three meals; Defendant Pollard

turned on Mr. Hester's water, but Mr. Hester did not consume any, and Defendant Pollard turned

off Mr. Hester's water a few minutes later. Doc. 52 at 12; Doc. 55-9 at 85, 88–89, 91.

On April 11, Mr. Hester refused his evening meal, swore at and gestured profanely

toward Defendant Pollard, and requested that his water be turned on just after midnight (that is,

in the early hours of April 12). Doc. 52 at 12–13; Doc. 52-1 at 286; Doc. 55-9 at 98. On April 12,

officers escorted Mr. Hester to the sally port then back to his cell ten minutes later; when a

behavioral health worker visited him that afternoon, Mr. Hester refused to get up. Doc. 52 at 13;

Doc. 55-6 at 13;[5] Doc. 55-9 at 103. On April 13, Mr. Hester would not wake up when a

behavioral health worker visited him, but he signaled to the worker that he was okay. Doc. 52 at

13; Doc. 55-6 at 13. That afternoon, Mr. Hester was escorted to a committee hearing regarding

his custody and classification. Doc. 52 at 13; Doc. 55-9 at 113; Doc. 53-1 at 202. On April 14,

---

[4] Undisputed Material Fact No. 39 indicates that this interaction took place on April 11, but the
document to which this fact cites indicates that this visit was on April 9, 2021. *Compare* Doc. 52
at 12 *with* Doc. 55-10 at 4.

[5] The underlying documentation notes are illegible. It is possible that they read, "Inmate Hester
refused to wake up and [illegible] his hand up."

Mr. Hester requested medical attention, and Defendant Pollard summoned medical staff. Doc. 52 at 13; Doc. 44-9 at 117. The same day, a nurse spoke with Mr. Hester and offered him water, which he refused. Doc. 52 at 13; *see also* Doc. 67-28 at 1.[6] However, he drank some water that evening. Doc. 52 at 13; Doc. 55-9 at 119. Medical personnel had a discussion with security staff and noted that Mr. Hester did not eat the meals served to him, but he did ask for water, and security staff periodically turned on the water supply and monitored his intake. Doc. 52 at 14; Doc. 55-10 at 3.

Mr. Hester refused various meals from April 15 through April 20. Doc. 52 at 14–15; Doc. 55-9 at 127, 130, 134, 138, 142, 145, 146, 151, 154–55, 165, 172, 174. On April 19, an officer flushed Mr. Hester's toilet, and Mr. Hester washed his hands. Doc. 55-9 at 161. The undisputed material facts state that Mr. Hester and Mr. Bolton were moved to Housing Unit 1 on April 21, 2021, and were placed in the same cell. Doc. 52 at 15. However, the exhibit cited to support this fact ("Ex. B") does not contain this information. *See* Doc. 54-2.

Mr. Hester does not dispute the material facts, but he does raise the following factual issue: "The defendants repeatedly accuse me of yelling and cursing at staff and/or refusing water while in seg/RHU, at times when the seg log (ex. K) does not show those staff as ever being present." Certainly, multiple undisputed material facts indicate that Mr. Hester cursed or refused water. However, the only undisputed material facts that *name* a staff member at whom Mr. Hester cursed or from whom he refused water are UMF No. 38, which states that on April 10, Defendant Pollard turned on Mr. Hester's water but Mr. Hester did not drink any, and UMF No. 40, which states that on April 11 at 2320 (11:20 p.m.), Mr. Hester shouted at Defendant Pollard. Doc. 52 at

---

[6] The GEO Defendants' *Martinez* Report cites to "Ex[.] L at Wexford 000227." Doc. 52 at 13. Exhibit L, or Doc. 55-10, does not contain a page labeled "Wexford 000227." However, the Wexford *Martinez* Report does contain such a page: Doc. 67-28 at 1.

12. The daily housing unit event log indicates that Defendant Pollard was assigned to the second shift on April 10, 2021, Doc. 55-9 at 90, and that during this shift he turned on Mr. Hester's water for approximately six minutes, *id.* at 91. The log also indicates that Defendant Pollard was assigned to the second shift on April 11, 2021, and conducted a security check at 2320 (11:20 p.m.). *Id.* at 97. In short, Defendant Pollard was working on the days at issue; accordingly, Mr. Hester has not raised a genuine dispute casting doubt on the validity of the records.

### C.  Analysis

The Eighth Amendment requires prison officials to "provide humane conditions of confinement . . . [including] adequate food, clothing, shelter, and medical care, and [to] take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotation marks omitted). It does not require prisons to be comfortable. *Id.* Rather, two requirements must be met for prison conditions to violate an inmate's Eighth Amendment rights: "First, the deprivation alleged must be, objectively sufficiently serious . . . result[ing] in the denial of the minimum civilized measure of life's necessities. . . . [Second,] a prison official must [exhibit] deliberate indifference to inmate health or safety." *Id.* at 834 (internal quotation marks omitted). Additionally, the length of stay is relevant: "a filthy, overcrowded cell and a diet of [gruel] might be tolerable for a few days and intolerably cruel for weeks or months." *Barney v. Pulsipher*, 143 F.3d 1299, 1311–12 (10th Cir. 1998) (internal quotation marks omitted).

Mr. Hester's access to water—to drink, to wash with, and to flush his toilet—were limited during his time in the RHU. But documentation indicates that Mr. Hester affirmatively refused at least three separate offers of water (Doc. 55-9 at 66; Doc. 55-10 at 4; Doc. 67-28 at 1), not counting instances in which his water was turned on but records do not demonstrate whether

he consumed any. Documentation also indicates that he told medical providers that he was fine or rejected offers of medical or therapeutic support on multiple occasions (Doc. 55-6 at 13–14; Doc. 55-10 at 4, 7, 9), and that he drank or washed with water multiple times when it was made available to him (Doc. 55-9 at 55, 119, 161). Mr. Hester argues that the defendants "falsely accuse [him] of refusing water," Doc. 74 at 3, and that "[t]he entire time [he] was in seg/RHU, [he] was never offered water," *id.* at 6, but he has not provided any evidence to support this argument. At the summary judgment stage, more is required.

While limiting a person's access to water certainly can constitute cruel and unusual punishment, Mr. Hester's documented refusals of water and medical support suggest that he was given access to more "humane conditions of confinement" and declined them, not that the GEO Defendants deprived him of them. *Farmer*, 511 U.S. at 832. Case law frowns upon Eighth Amendment claims by prisoners who choose not to consume the adequate food and water available to them. *See Austin v. Tennis*, 381 F. App'x 128, 133 (3d Cir. 2010) (no basis to conclude that commonwealth defendants were deliberately indifferent when they repeatedly offered meals to hunger-striking inmate, monitored him, and petitioned a court to treat him without his consent); *see also Rodriguez v. Briley*, 403 F.3d 952, 953 (7th Cir. 2005) (prisoner cannot "be permitted to engineer an Eighth Amendment violation" by "going on a hunger strike and blaming the prison for his resulting loss of weight"). The GEO Defendants have submitted uncontradicted evidence that they provided Mr. Hester with food, water, and medical care; Mr. Hester's refusals to eat, drink, or comply with medical directives such as daily weighing do not render the GEO Defendants deliberately indifferent.

That Mr. Hester's access to water was sometimes limited does not change the analysis. Courts have permitted limited restrictions to water and bathroom access for legitimate

penological reasons. *See Hinds v. Barela*, No. 2:20-cv-01011-MV-JFR, 2022 WL 1565268, at *7 (D.N.M. May 18, 2022) ("[B]eing made to wait for water or a bathroom visit is inconvenient, and at times even upsetting, but Defendants' use of the dry cell as a means of preventing the introduction of contraband into their facility and to otherwise protect residents and staff reflects sound and prudent jail policy," when Defendants "provided regular meals and drinks and accommodated the Plaintiff's need to use the restroom as expeditiously as circumstances permitted."), proposed findings and recommended disposition adopted, *Hinds v. Barela*, No. 2:20-cv-01011-MV-JFR, 2022 WL 2355452 (D.N.M. June 30, 2022); *Thomas v. Tice*, 948 F.3d 133, 142 (3d Cir. 2020) ("[W]hen administrative confinement in a dry cell is not foul or inhuman, and serves a legitimate penological interest, it will not violate the Eighth Amendment."); *Collier v. Adams*, 602 F. App'x 850, 853 (3d Cir. 2015) ("Given that the Defendants also established that they were aware that prisoners on hunger strike were monitored daily by medical staff, as Collier was, we also agree that Collier failed to show that they acted with deliberate indifference when they shut off the water to his cell."). In this case, the restrictions on Mr. Hester's water were for the legitimate penological purpose of monitoring his intake during a time when he was engaging in a hunger strike or personal fast. There is no genuine dispute (supported by evidence) over the material facts that Mr. Hester was repeatedly offered water and medical care while his water was turned off and he repeatedly rejected them. I therefore recommend that the Court find that limitations of Mr. Hester's access to water were not "objectively sufficiently serious" to violate the Eighth Amendment. *Farmer*, 511 U.S. at 834.

Mr. Hester argues that corrections department policy does not permit staff to turn off his water if it is established that he is undergoing a personal fast rather than a hunger strike. Doc. 74 at 2–3. It is true that NMCD's hunger strike policy only directs staff to turn off water in the case

of a hunger strike and issues no similar directive for a personal fast. *See generally* Doc. 55-12 (hunger strike and personal fast policy). But the affidavit of Vince Horton, LCCF Assistant Facility Administrator for Security, states that prison officials are required to monitor and record the nourishment and hydration of an inmate undertaking a personal fast by regulating the inmate's access to the water supply in his cell. Doc. 55-15 at 2. Mr. Hester has provided no documentation indicating that such a practice is forbidden during a personal fast.[7] The hunger strike and personal fast policy indicates that on the sixth day after an inmate initiates a fast, a medical professional shall review the inmate's nourishment and hydration—implying that the inmate's nourishment and hydration should be monitored, and, according to the affidavit of Vince Horton, the only way to monitor hydration is to regulate the inmate's access to water. With no evidence to support his argument, Mr. Hester cannot succeed at the summary judgment stage.

Mr. Hester also argues that the GEO Defendants violated the personal fast policy because the policy "requires the defendants to notify the Medical Director of NMCD of any personal fast on the sixth day. But they never did." Doc. 74 at 2. The personal fast policy states, "On the sixth day after initiating a fast, a medical professional shall review the inmate's nourishment and hydration." Doc. 55-12. Mr. Hester provides no evidence that the Medical Director of NMCD, rather than simply a medical professional, must review an inmate's nourishment and hydration on the sixth day of a personal fast. The undisputed material facts indicate that staff were notified of Mr. Hester's possible hunger strike on April 2, and on April 7—the sixth day—a group of medical and behavioral health providers reviewed Mr. Hester's situation, determined that he was

---

[7] Furthermore, whether Mr. Hester's behavior constituted a hunger strike or a personal fast was not always clear. Documentation from medical staff indicates that on April 6, 2021, he refused to sign a paper denying he was on a hunger strike. Doc. 55-10 at 7.

not on a hunger strike, elected to continue monitoring his condition, and recommended daily weight checks. Doc. 52 at 8, 11–12; Doc. 55-10 at 5.

In short, the undisputed material facts indicate that the GEO Defendants' restriction of Mr. Hester's access to water during his time in the RHU did not rise to the level of an Eighth Amendment violation because they provided, and Mr. Hester refused, water and medical care on multiple occasions during that time. As a result, I recommend that the Court grant the GEO Defendants' motion for summary judgment as it pertains to this incident. This includes the Eighth Amendment claim against Defendants Pollard and Massengil (Count I-D) and the "failure to remedy" claim against Defendants GEO, Santistevan, Massengil, Condarco, Valeriano, Gomez, and Pollard pertaining to this incident (Count I-E in part).

## IV.  Allegations Regarding the GEO Defendants' Failures to Remedy the Medical Defendants' Conduct (Count I-E in Part)

Mr. Hester also alleges that Defendants "GEO, Santistevan, Massengil, Condarco, Valeriano, Gomez, [and] Pollard" violated the Eighth Amendment "by failing to remedy the abuses" of the Medical Defendants (Count I-E in part). Doc. 11 at 6. The Medical Defendants, in turn, are alleged to have denied Mr. Hester medications, diagnoses, tests, and treatment for various conditions, to have made false statements about his condition to staff, and to have placed him in a COVID quarantine pod when he did not have COVID. *Id.* The GEO Defendants respond that GEO's contractual agreement with NMCD is for management and operational services, not medical care, and that GEO does not employ medical staff and has no duty to train or supervise the medical staff at LCCF. Doc. 56 at 13.

As an initial matter, I recommend granting summary judgment on these claims because of Mr. Hester's failure to exhaust administrative remedies as outlined *supra*. Nonetheless, in the event the Court disagrees with my analysis, I consider the merits below.

20

The contract between NMCD and LCCF indicates that NMCD will bear the costs of necessary medical, dental, and pharmaceutical care for the inmates by paying a heath care services contractor. Doc. 55-1 at 2. These services included, among other things, infection control programs, pharmacy services, regular physician visits, and "[o]n-site medical staff sufficient to provide for the medical needs of the population." *Id.* at 3. LCCF, in contrast, was responsible for providing appropriate space and security support. *Id.* at 2.

LCCF then contracted with GEO, requiring GEO to "provide [Lea County] with the Facility in full compliance with all applicable Standards, and shall operate, maintain and manage the Facility[.]" Doc. 55-2 at 2.[8] An affidavit from George Stephenson, Facility Administrator of LCCF and GEO employee, indicates that "[u]nder these contracts, GEO has no duty to train any member of the medical staff," "GEO does not employ any medical providers at LCCF," "GEO does not provide medical services or advice to inmates at LCCF," and "No employee of GEO has any personal involvement in diagnosing or treating any inmate's medical conditions, or in hiring, retaining, training or supervising any medical provider involved in diagnosing or treating any inmate's medical conditions." Doc. 54-2 at 2–3.

Mr. Hester responds that GEO disclaiming responsibility over medical care is a "semantic game[]" and that "[i]t is common knowledge that refusing a person water will cause them medical problems, and potentially death." Doc. 69 at 1. But this argument does not address the dispute at issue: the GEO Defendants' assertions that they lack responsibility for medical care pertain only to the claims that the GEO Defendants are responsible for the alleged misconduct of

---

[8] GEO also was obligated to provide various mental health services, which do not appear to be at issue. *See id.* at 3.

the Medical Defendants. The issue of whether Mr. Hester received adequate access to water

while in the RHU is a separate claim, as discussed above.

> Mr. Hester argues further that the GEO Defendants

> deny they did anything wrong. But something wrong definitely happened in their facility, with the knowledge and participation of their employees. Further, when one is in a custodial position over someone else (as the Geo defendants are in relation to me), they have a legal and moral obligation to intervene when they should be expected to know the actions of a third party could cause injury, damages, and/or death to a person in their custodial care (as in the actions of defendants Wexford and NMCD in this case).

*Id.* But not every "wrong" that happens in a facility that GEO manages is GEO's legal

responsibility. GEO and its employees had limited duties in terms of medical care: to provide

transportation and security services for inmates who need to travel to and from outside medical

service providers, Doc. 55-2 at 3, and to provide certain mental health services not at issue in this

case, *id.* at 5. These obligations do not encompass any duty to supervise medical staff or health

care services contractors.

Further, I do not read Mr. Hester's argument to include allegations that the GEO

Defendants failed to provide him access to medical care, as in a "gatekeeper" claim. *See* Doc. 78

at 10–11 (discussing such claims). Mr. Hester's argument is that *NMCD and Wexford* failed to

provide medical care, and that the GEO Defendants, as custodians over Mr. Hester, should have

intervened to ensure better medical care. *See* Doc. 69 at 1. I do not read his briefing to argue that

the GEO Defendants denied him access to adequate medical care by the Medical Defendants or

an external hospital.

For the above reasons, I recommend that the Court grant summary judgment in the GEO

Defendants' favor regarding the "failure to remedy" claims pertaining to the alleged wrongdoing

of the Medical Defendants.

### V.  Allegations Regarding Defendant Smith (Count II-I)

Mr. Hester alleges that Defendant Smith violated his Fourteenth Amendment rights "by repeatedly obstructing and denying [his] scheduled telephonic court hearings" (Count II-I). Doc. 11 at 6. The GEO Defendants argue that Mr. Hester failed to serve Defendant Smith and she was never made a party defendant to the action; therefore, any claims against her must be dismissed pursuant to Federal Rules of Civil Procedure 4(m) and 12(b)(5). Doc. 56 at 16. In all documents incorporated by reference into Mr. Hester's response, he does not mention the service issue at all. *See generally* Docs. 69–75. A review of the docket indicates that Mr. Hester attempted to serve Defendant Smith, *see* Doc. 12 at 14, but nothing on the docket indicates that Defendant Smith ever received the summons. The Court instructed Mr. Hester what to do "[i]f the initial attempt to obtain a waiver of service fail[ed]," Doc. 13 at 3, but Mr. Hester did not further attempt to serve Defendant Smith.

Because Defendant Smith was never served and never entered a limited appearance to contest service, the Court is in the peculiar position of ruling on a motion by one set of parties to dismiss a different party under Rule 12(b)(5). Nevertheless, it is clear that the Court lacks personal jurisdiction over any defendant not properly served. *Omni Cap. Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987) ("Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied."). Further,

> If a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

FED. R. CIV. P. 4(m).

23

The GEO Defendants' motion put Mr. Hester on notice that service is deficient as to Defendant Smith.[9] *See* Doc. 56 at 4. Mr. Hester did not address the service issue in his responses. *See generally* Docs. 69–76. Mr. Hester also was made aware of the proper procedure if Defendant Smith did not provide a waiver of service: to provide an updated address and to seek leave to proceed in forma pauperis. Doc. 13 at 3. Mr. Hester did not take these steps, nor has he shown good cause for failing to timely serve Defendant Smith. Accordingly, I recommend that the Court dismiss Mr. Hester's claim against Defendant Smith without prejudice for lack of personal jurisdiction and failure to serve.

## VI.  Allegations Regarding Defendant Valeriano (Count II-J)

Mr. Hester alleges that Defendant Valeriano "continually and repeatedly obstruct[ed], den[ied], and fail[ed] to respond to steps of the process of administrative remedy" in violation of the Fourteenth Amendment. Doc. 11 at 6. He lists several instances in which he filed grievances and claims that Defendant Valeriano "repeatedly refused all efforts at administrative remedy, repeatedly failed to correct the actions of personnel under [her] authority, promulgated a policy of deliberate indifference to my life and health, and promulgated a policy of deliberate indifference to the procedures of reporting incidents and maintaining accountability." *Id.* at 8. The GEO Defendants respond that there is no constitutional right to state prison grievance procedures; therefore, Mr. Hester does not state a claim for Fourteenth Amendment violations against Defendant Valeriano. Doc. 56 at 18–19.

---

[9] *See* footnote 3, *supra*, for a discussion of a similar issue in *Kelley v. City of Atchison, Kansas*, No. 2:21-cv-02123, 2021 WL 5140320, at *3 (D. Kan. Nov. 4, 2021).

As an initial matter, I recommend granting summary judgment on this claim because of Mr. Hester's failure to exhaust administrative remedies as outlined *supra*. Nonetheless, in the event the Court disagrees with my analysis, I consider the merits below.

The Tenth Circuit has affirmed in multiple unpublished cases that prisoners do not have a constitutional right to or a liberty interest in effective prison grievance procedures. *Von Hallcy v. Clements*, 519 F. App'x 521, 523 (10th Cir. 2013); *Burnett v. Allbaugh*, 715 F. App'x 848, 852 (10th Cir. 2017) ("A viable due process claim cannot rest on allegations of an unfair or inadequate grievance process."). I therefore recommend that the Court grant summary judgment in favor of the GEO Defendants on this claim.

### VII.  GEO's Failure to Train, Supervise, and Direct Its Personnel (Counts I-F and II-K)

Finally, I turn to the claims that GEO failed to train, supervise, and direct its personnel and promulgated policies such that the alleged abuses by the Medical Defendants or Defendants Alderete, Pollard, and Massengil occurred in violation of the Eighth Amendment (Count I-F), Doc. 11 at 6, and such that the alleged abuses by the above defendants as well as other abuses by the Medical Defendants, Defendant Smith, and Defendant Valeriano occurred in violation of the Fourteenth Amendment (Count II-K), *id.*

As an initial matter, I recommend granting summary judgment on the claims pertaining to alleged abuses by the Medical Defendants, Defendant Smith, and Defendant Valeriano because of Mr. Hester's failure to exhaust administrative remedies as outlined *supra*. The claims against GEO derive from the same underlying allegations and therefore also have not been exhausted through the grievance process. Nonetheless, in the event the Court disagrees with my analysis, I consider the merits below.

The United States Supreme Court has held that Section 1983 claims apply to local governing bodies where, "under color of some official policy," the local government causes an employee to violate a person's constitutional rights. *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 692 (1978). The Tenth Circuit has extended the *Monell* doctrine to private defendants in Section 1983 cases. *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003).

### A.  Medical Defendants

The *Monell* claims pertaining to the Medical Defendants cannot survive. As addressed above, GEO is not responsible for the medical decision-making of the Medical Defendants. Doc. 54-2 at 3 ("GEO has no involvement in decisions regarding whether an employee should be seen by an off-site medical provider. . . . No employee of GEO has any personal involvement in diagnosing or treating any inmate's medical conditions, or in hiring, retaining, training or supervising any medical provider involved in diagnosing or treating any inmate's medical conditions."). Defendant Wexford has no contractual relationship with GEO. *Id*. Defendant Chamblin is not a GEO employee. *See id.* ("GEO does not employ any medical providers at LCCF, including any of the individuals referenced in the Amended Complaint."). Mr. Hester has provided no evidence of any relevant policy that GEO may have promulgated pertaining to inmate access to medications, diagnoses, tests, treatments, placement in a COVID quarantine pod, access to review a medical file, or communication regarding an inmate's condition. Accordingly, I recommend dismissing the portion of Counts I-F and II-K that pertain to a failure to train, supervise, or direct the Medical Defendants.

### B. Defendant Alderete

The *Monell* claims pertaining to failing to train, supervise or direct Defendant Alderete also cannot survive. As discussed above, GEO argues that Mr. Hester lacks evidence to support an Eighth Amendment claim against Defendant Alderete, and I recommend summary judgment in GEO's favor on the failure-to-remedy issue. Without an underlying constitutional violation, the *Monell* claim also must fail.

### C. Defendants Pollard and Massengil

The *Monell* claims pertaining to failing to train, supervise, or direct Defendants Pollard and Massengil also must fail. Section 1983 violations generally, and *Monell* claims specifically, pertain to constitutional violations. *See* 42 U.S.C. § 1983 (addressing person who "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof *to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws*" (emphasis added)). Because I recommend finding that Mr. Hester did not suffer constitutional injuries based on the incidents involving access to water in the RHU, a *Monell* claim cannot survive against GEO based on Mr. Hester's time in the RHU.

### D. Defendant Smith

The *Monell* claims pertaining to failing to train, supervise, or direct Defendant Smith cannot survive. The undisputed material facts do not discuss Defendant Smith's conduct. *See generally* Doc. 52 at 4–19. However, a party moving for summary judgment may satisfy its burden by demonstrating that the nonmoving party has no evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial."). The GEO Defendants allege that Mr. Hester's claims against

GEO, based on Defendant Smith's alleged actions limiting Mr. Hester's access to his Medicaid

fraud hearing, must fail because Mr. Hester lacked a constitutional right to attend this hearing.

Doc. 56 at 17. That is, inmates only have a constitutional right to litigate issues regarding their

confinement, including Section 1983 claims and applications for writs of habeas corpus. *Id.* at

16.

> The GEO Defendants accurately state the law:
>
> The tools [the law[10]] requires to be provided [to inmates] are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration.

*Lewis v. Casey*, 518 U.S. 343, 355 (1996). Mr. Hester alleges that the hearing pertained to his

concerns that someone was defrauding Medicaid using his name; it was not a proceeding related

to any challenge to Mr. Hester's sentence or his conditions of confinement. *See* Doc. 11 at 6–7.

Therefore, deprivation of access to this court hearing does not rise to the level of Fourteenth

Amendment injury as a matter of law. Without an underlying constitutional violation, the *Monell*

claim must fail.

**E.  Defendant Valeriano**

The *Monell* claims pertaining to failing to train, supervise, or direct Defendant Valeriano

must fail because, as discussed above, Mr. Hester did not suffer constitutional injuries based on

Defendant Valeriano's conduct. Without an underlying constitutional violation, the *Monell* claim

must fail.

---

[10] The Supreme Court case that requires these tools is *Bounds v. Smith*, 470 U.S. 817 (1977).

### F. Conclusion

Accordingly, I recommend granting the GEO Defendants' motion for summary judgment

on the claims that GEO failed to train, supervise, and direct its personnel.

## CONCLUSION

In summary, I recommend the following rulings on the counts pertaining to the GEO

Defendants:

(1) Count I-C (Defendant Alderete): dismiss without prejudice under Federal Rules of Civil Procedure 4(m) and 12(b)(5) for lack of personal jurisdiction and failure to serve.

(2) Count I-D (Defendants Pollard and Massengil): grant summary judgment in favor of the GEO Defendants on the merits.

(3) Count I-E ("failure to remedy" claims):

    a) Failure to remedy the conduct of the Medical Defendants: grant summary judgment in favor of the GEO Defendants based on failure to exhaust administrative remedies, or, if the Court disagrees, the same result on the merits.

    b) Failure to remedy the conduct of Defendant Alderete:
- As against GEO: grant summary judgment in favor of GEO on the merits.
- As against the individual defendants: proceed under Rule 56(f) by providing the parties with notice and an opportunity to respond to the Court's belief that Mr. Hester has no evidence to support his claims against individual defendants Santistevan, Massengil, Condarco, Valeriano, Gomez, and Pollard for failing to remedy Defendant Alderete's alleged abuses. If the parties do not provide evidence in support of these claims within 30 days, I recommend that the Court grant summary judgment in favor of these individual defendants on these claims under Federal Rule of Civil Procedure 56(f).

    c) Failure to remedy the conduct of Defendants Pollard and Massengil: grant summary judgment in favor of the GEO Defendants on the merits.

(4) Count I-F ("failure to train, supervise, and direct personnel" claims):

    a) Pertaining to the Medical Defendants: grant summary judgment in favor of the GEO Defendants based on failure to exhaust administrative remedies, or, if the Court disagrees, the same result on the merits.

    b) Pertaining to Defendant Alderete, Defendant Pollard, and Defendant Massengil: grant summary judgment in favor of the GEO Defendants on the merits.

(5) Count II-I (Defendant Smith): dismiss without prejudice under Federal Rules of Civil Procedure 4(m) and 12(b)(5) for lack of personal jurisdiction and failure to serve.

(6) Count II-J (Defendant Valeriano): grant summary judgment in favor of the GEO Defendants based on failure to exhaust administrative remedies, or, if the Court disagrees, the same result on the merits.

(7) Count II-K ("failure to train, supervise, and direct personnel" claims):

    a) Pertaining to the Medical Defendants, Defendant Smith, and Defendant Valeriano: grant summary judgment in favor of the GEO Defendants based on failure to exhaust administrative remedies, or, if the Court disagrees, the same result on the merits.

    b) Pertaining to Defendants Alderete, Pollard, and Massengil: grant summary judgment in favor of the GEO Defendants on the merits.

In short, I recommend granting in part and denying in part the GEO Defendants' Motion for Summary Judgment (Doc. 56); the partial denial derives from my recommendation to proceed under Rule 56(f) as described above.

---

**THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these **Proposed Findings and Recommended Disposition** they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). Written objections must be both timely and specific. *United States v. One Parcel of Real Prop., With Buildings, Appurtenances, Improvements, & Contents, Known as: 2121 E. 30th St., Tulsa, Oklahoma*, 73 F.3d 1057, 1060 (10th Cir. 1996). A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. Failure to file timely and specific objections will result in waiver of *de novo* review by a district or appellate court. *Id.* In other words, if no objections are filed, no appellate review will be allowed.

---

LAURA FASHING
UNITED STATES MAGISTRATE JUDGE